894 So.2d 661 (2004)
BRIARCLIFF NURSING HOME, INC., d/b/a Integrated Health Services at Briarcliff, and James Anthony Clements
v.
David TURCOTTE, executor of the estate of Noella Turcotte, deceased.
Briarcliff Nursing Home, Inc., d/b/a Integrated Health Services at Briarcliff, and James Anthony Clements
v.
Kyra L. Woodman, administratrix of the estate of Sarah Carter, deceased.
1012193 and 1012195.
Supreme Court of Alabama.
June 25, 2004.
*662 J. Mitchell Frost, Jr., and Champ Lyons III of Ferguson, Frost & Dodson, LLP, Birmingham (brief on application for rehearing filed by J. Mitchell Frost, Jr., Neal D. Moore III, and Rachel R. Thompson of Ferguson, Frost & Dodson, LLP, Birmingham), for appellants.
Robert L. Pittman of Beasley, Allen Crow, Methvin, Portis & Miles, P.C., Montgomery, for appellee David Turcotte.
J. Paul Sizemore of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery, for appellee Kyra L. Woodman.
Russell Jackson Drake of Whatley Drake, L.L.C., Birmingham; Deborah Zuckerman, Bruce Vignery, and Dorothy Siemon of the AARP Foundation, Washington, D.C.; Michael Schuster, of the AARP, Washington, D.C.; and Edward King of the National Senior Citizens Law Center, Washington, D.C., for amici curiae AARP, National Citizens' Coalition for Nursing Home Reform, and Alabama Silver Haired Legislature, in support of appellees.
*663 Richard J. Brockman and Mary Brunson Whatley of Johnston Baron Proctor & Powell, LLP, Birmingham, for amicus curiae the Alabama Nursing Home Association, in support of the appellants.
Matthew C. McDonald and Kirkland E. Reid of Miller Hamilton Snider & Odom, LLC, Mobile, for amici curiae the Alabama Civil Justice Reform Committee and the Business Council of Alabama, in support of the appellants.
David G. Wirtes, Jr., and George W. Finkbohner III of Cunningham, Bounds, Yance, Crowder & Brown, LLC, Mobile, for amicus curiae National Association of Consumer Advocates, in support of appellees.
Leila H. Watson of Cory, Watson, Crowder & DeGaris, P.C., Birmingham, for amicus curiae Alabama Trial Lawyers Association, in support of appellees.

On Application for Rehearing
PER CURIAM.
The opinion of February 6, 2004, is withdrawn and the following is substituted therefor.
Briarcliff Nursing Home, Inc., d/b/a Integrated Health Services at Briarcliff, and James Anthony Clements, the defendants in actions pending in the Shelby Circuit Court, appeal the denial of their motions to compel the plaintiffs David Turcotte, executor of the estate of Noella Turcotte, deceased, and Kyra L. Woodman, administratrix of the estate of Sarah Carter, deceased, to arbitrate their wrongful-death claims. The appeals have been consolidated because they raise identical issues. We reverse and remand.

I.
Turcotte and Woodman separately sued Briarcliff and Clements for the alleged wrongful deaths of Noella Turcotte and Sarah Carter while Noella and Sarah were residents at a nursing home owned and operated by Briarcliff. Clements was the administrator of the nursing home at the time of Noella's and Sarah's deaths. (Briarcliff and Clements are hereinafter collectively referred to as "Briarcliff.") Briarcliff moved to compel arbitration on the ground that agents for Noella and Sarah had signed admission contracts that contained an arbitration provision. Turcotte and Woodman opposed the motions to compel arbitration on the grounds that neither of them, in their capacities as executor and administratrix, respectively, of the deceased estates had signed or had otherwise entered into the admission contracts and that the "fiduciary parties" who signed the admission contracts for Noella and Sarah while they were alive could not contractually affect the then nonexistent wrongful-death claims. Turcotte and Woodman also argued that the arbitration provision was a part of a contract of adhesion and was unconscionable.
The arbitration provision in the admission contract[1] reads:
"Pursuant to the Federal Arbitration Act, any action, dispute, claim or controversy of any kind (e.g., whether in contract or in tort, statutory or common law, legal or equitable, or otherwise) now existing or hereafter arising between the parties in any way arising out of, pertaining to or in connection with the provision of health care services, any agreement between the parties, the provision of any other goods or services by the Health Care Center or other transactions, contracts or agreements of any *664 kind whatsoever, any past, present or future incidents, omissions, acts, errors, practices, or occurrence causing injury to either party whereby the other party or its agents, employees or representatives may be liable, in whole or in part, or any other aspect of the past, present or future relationships between the parties shall be resolved by binding arbitration administered by the National Health Lawyers Association (the `NHLA').
"THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS CONTRACT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF ITS TERMS."
(Boldface type and capitalization original.) The admission contract relating to Noella is signed by David Turcotte in his capacity as "Fiduciary Party," and the admission contract relating to Sarah is signed by Kyra Woodman in her capacities as "Fiduciary Party" and "Attorney-In-Fact under [a] validly executed power of attorney."
The trial court denied Briarcliff's motions to compel arbitration. Briarcliff appeals, arguing that Turcotte and Woodman must arbitrate their wrongful-death claims because Noella and Sarah, through their agents, signed the admission contracts containing the arbitration provision.

II.
The standard of review of a trial court's ruling on a motion to compel arbitration is de novo. W.D. Williams, Inc. v. Ivey, 777 So.2d 94, 98 (Ala.2000).
"`The party seeking to compel arbitration has the initial burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction substantially affecting interstate commerce. "[A]fter a motion to compel arbitration has been made and supported, the burden is on the nonmovant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question."'"
SouthTrust Bank v. Ford, 835 So.2d 990, 993 (Ala.2002) (citations omitted) (quoting American Gen. Fin., Inc. v. Morton, 812 So.2d 282, 284 (Ala.2001)).

III.
Turcotte and Woodman brought these wrongful-death actions in the names of "the Estate of Noella Turcotte, by and through its Executor David Turcotte" and "the Estate of Sarah Carter by and through its Administratrix, Kyra L. Woodman," respectively. The wrongdoing alleged in both complaints is predicated upon an alleged breach of the duties owed by Briarcliff to Noella and Sarah as residents of the nursing home. Both Noella and Sarah were residents of the nursing home pursuant to the admission contracts, which contained the arbitration provisions.
In SouthTrust Bank, 835 So.2d 990, the underlying dispute involved SouthTrust's negligent cashing of a check on Edwin Edwards's account. Edwards died before the dispute was resolved, and Melody Ford, his daughter, as the administratrix of Edwards's estate, sued SouthTrust alleging that it had negligently cashed the check. She also sued SouthTrust in her individual capacity, asserting related claims. The deposit agreement that governed Edwards's account at SouthTrust contained an arbitration provision. On the basis of that provision, SouthTrust moved to compel arbitration; the trial court denied the motion. SouthTrust appealed, and this Court found that "Melody's claim to recover the value of the improperly paid check is subject to arbitration because she is asserting that claim *665 in her role as the administratrix of Edwards's estate." Id. at 994. We further stated:
"We recognize that an administratrix of a decedent's estate stands in the shoes of the decedent. We also recognize that the `[p]owers [of an executor], in collecting the debts constituting the assets of the estate, are just as broad as those of the deceased.' For the same reason the powers of an executor or an administrator encompasses all of those formerly held by the decedent, those powers must likewise be restricted in the same manner and to the same extent as the powers of the decedent would have been. Thus, where an executor or administrator asserts a claim on behalf of the estate, he or she must also abide by the terms of any valid agreement, including an arbitration agreement, entered into by the decedent."
Id. at 993-94 (citations omitted). Therefore, in this case, Turcotte, as executor of Noella's estate, and Woodman, as administratrix of Sarah's estate, are bound by the arbitration provisions contained in the admission contracts.

IV.
We now address Turcotte and Woodman's claims that the arbitration provision was unconscionable. "The burden of proving unconscionability of an arbitration agreement rests with the party challenging the agreement." Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 504 (Ala.1999), citing Ex parte McNaughton, 728 So.2d 592, 598 (Ala.1998). In Vann v. First Community Credit Corp., 834 So.2d 751, 753 (Ala.2002), this Court stated:
"In determining whether a contract is unconscionable, courts look to four factors: '(1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there was oppressive, one-sided or patently unfair terms in the contract.' Layne v. Garner, 612 So.2d 404, 408 (Ala.1992)."
Summarizing the Layne v. Garner, 612 So.2d 404 (Ala.1992), test in American General Finance, Inc. v. Branch, 793 So.2d 738, 748 (Ala.2000), we stated: "For ease of discussion, we can reduce the Layne v. Garner test further to one comprised of two essential elements: (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power." See also Steele v. Walser, [Ms. 1020652, October 31, 2003] 880 So.2d 1123, 1129 (Ala.2003)(stating that "[t]he '"applicable standards for determining unconscionability are set forth in American General Finance[, Inc. v. Branch], 793 So.2d [738] at 748 [(Ala.2000)]  whether there are (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power."'").

A. Terms that are grossly favorable to a party.
Turcotte and Woodman argue that, because the arbitration provision provides that disputes shall be resolved by arbitration administered by the National Health Lawyers Association ("NHLA"), this "dispute resolution procedure is `unreasonably favorable' to the industry and `is oppressive, one-sided [and] patently unfair' to the typical, aged nursing home resident." Turcotte's and Woodman's briefs, p. 47. Turcotte and Woodman argue that because the NHLA is part of the American Health Lawyers Association ("AHLA"), which, they argue, is a "puppet for the health care and long term care industries" (Turcotte's and Woodman's briefs, p. 44), the industry "further `stacks the deck' by establishing a system of dispute resolution *666 wherein industry insiders and employers bear sole, non-appealable decision making authority. Such one sided forms of dispute resolution were never envisioned by the drafters of the FAA." Turcotte's and Woodman's briefs, p. 46. Turcotte and Woodman cite Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813, 824, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), holding that constitutional due process entitles parties to unbiased decision-makers. However, Turcotte and Woodman have not established that the NHLA is biased in conducting its arbitration proceedings. Turcotte's and Woodman's only support for this proposition is the "History" of the AHLA provided on its Web site. There is no evidence indicating that the NHLA is biased in its arbitration proceedings, nor is there any other evidence indicating that the terms of the arbitration provision are grossly favorable to either party, or that the admission contract is "oppressive, one-sided and patently unfair." Therefore, we conclude that Turcotte and Woodman have not established that the terms of the arbitration provision grossly favor Briarcliff.

B. Overwhelming bargaining power.
Turcotte and Woodman argue that Shelby County has only two nursing homes and that, therefore, "there can be no `meaningful choice' on the part of potential residents"; thus, they argue, "to say that [Briarcliff and the other local nursing home] have unequal bargaining power is therefore an understatement." However, even if there are only two nursing homes in Shelby County, Turcotte and Woodman have not asserted that an elderly person in Shelby County lacks meaningful options to live in a nursing-home in another county or to have in-home care.
Turcotte and Woodman argue that to meet their burden of proof it is not necessary for them to show that the nursing-home market was completely closed. Indeed, in American General Finance, Inc. v. Branch, 793 So.2d at 751, this Court stated that "[i]n order to meet her burden of proof on this issue [overwhelming bargaining power], a consumer need not show that the market was completely closed, only that she was unable to acquire goods or services without considerable expenditure of time and resources." Turcotte and Woodman have not shown that they were "unable to acquire" nursing-home care for Noella and Sarah "without considerable expenditure of time and resources." The only support offered by Turcotte and Woodman for their argument is that, according to the 2000 federal decennial census, Shelby County has 143,293 residents, 8.5% of whom are "persons 65 years old and over." Turcotte and Woodman argue that these figures mean that there are 12,180 elderly persons in Shelby County "fighting to get into two nursing homes with a combined maximum of 361 beds." Turcotte's brief, pp. 52-53; Woodman's brief, p. 52. Turcotte and Woodman fail to recognize that not every person 65 years of age and older is in need of or desires nursing-home care. Turcotte and Woodman fail to provide any evidence regarding the actual number of elderly persons seeking to reside in nursing homes in Shelby County.
In Branch, Branch submitted several affidavits from merchants stating that those merchants also required arbitration. In other words, Branch submitted evidence indicating that the service she was seeking was not available unless she agreed to arbitration. In the present case, Turcotte and Woodman have not shown that nursing home care is unavailable without agreeing to arbitration. Therefore, Turcotte and Woodman did not demonstrate "an absence of a meaningful choice," Vann, 834 So.2d at 753, nor did Turcotte *667 and Woodman demonstrate that Briarcliff had overwhelming bargaining power.
Because Turcotte and Woodman have not shown that the terms of the arbitration provision grossly favor Briarcliff or that Briarcliff has overwhelming bargaining power, we conclude that Turcotte and Woodman have not met their burden of proof that the arbitration provision is unconscionable.
Turcotte and Woodman argue also that the admission contract is a contract of adhesion. A contract of adhesion is "`one that is offered on a "take it or leave it" basis to a consumer who has no meaningful choice in the acquisition of the goods or services.'" Gadsden Budweiser Distrib. Co. v. Holland, 807 So.2d 528, 533 (Ala.2001) (quoting Ex parte McNaughton, 728 So.2d 592, 599 (Ala.1998) (Almon, J., dissenting)). Because Turcotte and Woodman have not demonstrated that Noella and Sarah did not have a "meaningful choice" when deciding on nursing-home care, we conclude that Turcotte and Woodman failed to establish that the contract before us is one of adhesion.

V.
Turcotte and Woodman finally argue that the arbitration provision is not enforceable because, they argue, the transaction evidenced by the contract does not substantially affect interstate commerce. They argue that nursing-home-services contracts involve labor, which they argue is an intrastate activity. Turcotte and Woodman cite Community Care of America of Alabama, Inc. v. Davis, 850 So.2d 283 (Ala.2002), for the proposition that the primary purpose of an admission contract between a resident and a nursing-care facility is labor, which is an intrastate activity. However, in Community Care, this Court also stated:
"The test of the enforceability of the arbitration clause in the Admission Contract in this case is not, as Community Care contends, whether the transaction substantially affects interstate commerce  which is the proper analysis in cases not involving § 10-2B-15.02, see Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000)  but `whether the main or primary purpose of the [transaction] constitutes an interstate or intrastate activity.' Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc., 490 So.2d 1242, 1244-45 (Ala.Civ.App.1986)."
Community Care, 850 So.2d at 287. In Community Care, Community Care was attempting to enforce a contract (specifically an arbitration provision in the admission contract); however, it was not qualified to do business in Alabama at the time it entered into the admission contract. This Court held that the penalty of § 10-2B-15.02(a), Ala.Code 1975, extends to the enforcement of arbitration provisions. Id. at 286. Section 10-2B-15.02(a) is a "door closing" statute that "`bars a foreign corporation not qualified to do business in Alabama from enforcing in an Alabama court a contract it made in Alabama.'" Community Care, 850 So.2d at 286 (quoting Hays Corp. v. Bunge Corp., 777 So.2d 62, 64 (Ala.2000)). Therefore, this Court held that § 10-2B-15.02(a) voided the admission contract and changed the test of the enforceability of the arbitration provision from whether it substantially affects interstate commerce to "`whether the main or primary purpose of the [transaction] constitutes an interstate or intrastate activity.'" 850 So.2d at 287 (quoting Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc., 490 So.2d 1242, 1244-45 (Ala.Civ.App.1986)). The present case does not involve § 10-2B-15.02(a); therefore, the proper test is whether the activity substantially affects interstate commerce.
*668 Briarcliff presented evidence that its regional office is in Florida and that its headquarters are in Maryland. Briarcliff also has several out-of-state patients, and it receives regular shipments of supplies from Georgia and from Wisconsin. Briarcliff purchases medicine from Pharmerica, which is based in Florida and which is a subsidiary of a California corporation. Also, both Noella and Sarah were Medicare patients. Community Care of America of Alabama, Inc., involved a similar situation. In Community Care, Community Care submitted an affidavit demonstrating many of the same facts alleged in the present case, including that Community Care's regional office was in Florida and its corporate office was in Maryland; that Community Care received regular shipments of supplies from other states; that it purchased medications from Pharmerica; and that Davis was a Medicare patient. Id. at 285. In Community Care we concluded that "[t]he affidavit [setting forth the aforementioned facts] demonstrates a nexus with interstate commerce." 850 So.2d at 285. Because the facts of Community Care are similar to the facts in the present case, and because this Court in Community Care decided that the activities affected interstate commerce, we conclude that Briarcliff's activities substantially affect interstate commerce.

VI.
Because Turcotte and Woodman are bound by the admission contracts, we find that the trial court erred in denying Briarcliff's motions to compel arbitration. We also conclude that the arbitration provision is not unconscionable and that the contract containing the arbitration provision is not one of adhesion, and that Briarcliff's activities substantially affect interstate commerce. Therefore, we reverse the trial court's orders denying Briarcliff's motions to compel arbitration and remand the case for further proceedings consistent with this opinion.
APPLICATION OVERRULED; OPINION OF FEBRUARY 6, 2004, WITHDRAWN; OPINION SUBSTITUTED.
1012193  REVERSED AND REMANDED.
1012195  REVERSED AND REMANDED.
HOUSTON, SEE, BROWN, HARWOOD, and STUART, JJ., concur.
JOHNSTONE and WOODALL, JJ., dissent.
LYONS, J., recuses himself.
JOHNSTONE, Justice (dissenting).
I concur in Justice Woodall's dissent. I add some dissenting observations of my own.
David Turcotte, executor of the estate of Noella ("the executor"), and Kyra Woodman, administratrix of the estate of Sarah ("the administratrix"), separately sued Briarcliff and James Anthony Clements (hereinafter collectively called "Briarcliff") for wrongful death. Briarcliff moved to compel arbitration on the ground that agents for Noella and Sarah, respectively, had each signed an admission contract containing an arbitration provision. The executor and the administratrix opposed the motions to compel arbitration on the grounds that neither of them in their respective capacities as executor and administratrix had signed or otherwise entered the admission contract and that the "fiduciary parties" who signed for Noella and Sarah while they were alive could not contractually affect the then-nonexistent wrongful death claims.
The scope of the arbitration provision in each admission contract is, by the express *669 terms of the provision, limited to "any action, dispute, claim or controversy of any kind ... now existing or hereafter arising between the parties." (Emphasis added.) The admission contract for the then-living Noella was signed by David Turcotte in his capacity as "Fiduciary Party." The admission contract for the then-living Sarah was signed by Kyra Woodman in her capacities as "Fiduciary Party" and "Attorney-In-Fact under [a] validly executed power of attorney."
Denying the motions to compel arbitration, the trial court correctly stated, in pertinent part:
"The Plaintiff argues that the estate is a non-signatory to the agreement and therefore is not bound by the clause. That argument is based on the theory that a wrongful death action is a new, non-derivative cause of action based upon the death of Noella Turcotte [or Sarah Carter] but distinct from any cause of action that may have existed before her death. This theory is based upon interpretations of opinions from the Alabama Supreme Court on the subject. Our Court has held that the Wrongful Death Statute creates a new cause of action, not a derivative one or one based upon the right of succession to the decedent. Breed v. Atlanta, B & C R.R., 241 Ala. 640, 4 So.2d 315 (1941).
"Defendant[s] argue[] David Turcotte [or Kyra L. Woodman] acted as agent and also Plaintiff is a third party beneficiary and therefore this action is covered by said clause. This Court disagrees.
"The estate was not in existence at the time the nursing home contract was signed. David Turcotte [or Kyra L. Woodman] signed on behalf of the decedent, but as the estate did not exist, he [or she] did not sign on behalf of the estate.
"Further, there is no proof that the decedent's estate is a signatory of the contract containing the arbitration provision.
"`"`[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.'" AT & T Techns., Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and see Ex parte Lovejoy, 790 So.2d 933 (Ala.2000).'
"While there is no Alabama precedent concerning the arbitration of a wrongful death claim, it appears the claim, as well as the claimant, i.e., the estate, are not derivative. As mentioned in Plaintiff's brief, `Alabama's Wrongful Death Statute is unique in that it allows for the recovery of punitive damages.' The statute exists for preservation of human life. Black Belt Wood Co. v. Sessions, 514 So.2d 1249 (Ala.1986). Its purpose is punitive. C.F. Halstead Contractor, Inc. v. Lowery, 51 Ala.App. 86, 282 So.2d 909, cert. denied, 291 Ala. 775, 282 So.2d 913 (1973). As stated in Pace v. Armstrong World Industries, Inc., 578 So.2d 281 (Ala.1991):
"`The purpose of Alabama's wrongful death statute is to protect human life and to prevent homicides by wrongful act, omission, or negligence of persons or corporations. Mattison v. Kirk, 497 So.2d 120 (Ala.1986); and Black Belt Wood Co. v. Sessions, 514 So.2d 1249 (Ala.1986). The reason and necessity for the act was to provide a remedy to the family of a decedent whose death was caused by the wrongful act or omission of another.'

*670 "Therefore, this is a new cause of action that is not derivative."
On appeal, Briarcliff contends that, because Noella and Sarah, during their lives and through their respective agents, signed the admission contracts containing the arbitration provision, Noella's executor and Sarah's administratrix must submit their wrongful death claims to arbitration.
"[A]rbitration agreements [are] as [much] enforceable as other contracts, but not more so." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). "`[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" AT & T Techs., Inc. v. Communications Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).
"`When deciding whether parties agree to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts.'" Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 459 (Ala.2000) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). "`The courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the interest of the parties.'" Blount Int'l, Ltd. v. James River-Pennington, Inc., 618 So.2d 1344, 1346 (Ala.1993) (quoting Goldberg v. Bear, Stearns & Co., 912 F.2d 1418, 1419-20 (11th Cir.1990)). Accord Modern Woodmen of America v. McElroy, 815 So.2d 520, 526 (Ala.2001).
"A wrongful death action is purely statutory; no such action existed at common law." Waters v. Hipp, 600 So.2d 981, 982 (Ala.1992). "Section 6-5-410, [Ala.Code 1975], authorizes a personal representative to commence a wrongful death action." Smith v. Tribble, 485 So.2d 1083, 1085 (Ala.1986). Accord Waters."A `personal representative,' for the purposes of § 6-5-410, is an executor or an administrator." Waters, 600 So.2d at 982. Accord Tribble.
In Breed v. Atlanta B & C R.R., 241 Ala. 640, 4 So.2d 315 (1941), Joe Breed was serving a life sentence in an Alabama prison at the time he was struck and killed by a train. The administrator of Breed's estate filed a wrongful death action against the railroad. In a plea of abatement, the railroad argued that,
"in consequence of his conviction and sentence to life imprisonment, [Breed] was civiliter mortuus, and therefore deprived of all civil rights including the right to redress for civil injury resulting from the defendant's delict, and therefore under the condition in the statute `if the testator or intestate could have maintained an action for such wrongful act, omission, or negligence, if it had not caused death,' the life of said [Breed] was not within the protective provision of the statute, and the plaintiff [administrator] was without legal right to sue. (Italics supplied.)"
241 Ala. at 642, 4 So.2d at 316. The administrator demurred to the plea of abatement. The trial court overruled the administrator's demurrer. The ruling by the trial court overruling the administrator's demurrer effectively precluded the administrator from maintaining a wrongful death action. The administrator appealed. In reversing the judgment of the trial court, this Court held:
"The statute, Code of 1923, § 5293, Code 1940, Tit. 61, § 3, modifies and reaffirms the common law to the effect that a conviction and sentence to life imprisonment, constitutes civil death  *671 that state of a person who, although possessing natural life, has lost all his civil rights and as to them is civilly dead.
"The answer to appellee's contention is that Code, § 5696 [now § 6-5-410, Ala.Code 1975], does not deal with the civil rights of persons whose death is caused by `wrongful act, omission, or negligence.' It deals with the natural right of life which is in no way affected by a conviction and sentence to life imprisonment. The very sentence and judgment of the court imposing it recognizes and confirms the right of the convict to life. The purpose and scope of our statute, Code 1923, § 5696 [now § 6-5-410, Ala.Code 1975], whatever the rule may be elsewhere, is to protect human life; to prevent homicides by wrongful act, omission or negligence of persons and corporations, their agents and servants; and to stimulate diligence in the protection of the natural right to live, without respect to the personal condition or disability of the person so protected.
"....
"The right of action which the statute [now § 6-5-410] gives is a new right, not derivative nor the right of succession to the person slain. It is not a right of property, and the personal representative in bringing and prosecuting the suit acts as an agent of legislative appointment for the effectuation of the public policy it declares  the prevention of homicides.

"In Holt v. Stollenwerck, [174 Ala. 213, 56 So. 912 (1911)], the court speaking through Sayre, J., observed: `The right to prosecute an action for the wrongful death of his decedent is vested by the statute creating the right ... in the personal representative for a definite legislative purpose, to prevent homicide. In prosecuting such action, the personal representative does not act strictly in his capacity as administrator of the estate of his decedent, because he is not proceeding to reduce to possession the estate of his decedent, but rather he is asserting a right arising after [his decedent's] death, and because the damages recovered are not subject to payment of the debts or liabilities of the decedent. He acts rather as an agent of legislative appointment for the effectuation of the legislative policy, and upon recovery as a quasi trustee for those who stand in the relation of distributees to the estate strictly so called. And the right is vested in the personal representative alone.'"
Breed, 241 Ala. at 642-43, 4 So.2d at 316-17 (citations omitted; emphasis added). "The cause of action here sued on [wrongful death] is created by § 123, Tit. 7, Code of 1940 [now § 6-5-410, Ala.Code 1975]. The chose in action here never did belong to the intestate; the statute creates it only upon his wrongful death." Ivey v. Wiggins, 276 Ala. 106, 108, 159 So.2d 618, 619 (1964).
Because a wrongful death action does not derive from the rights of a decedent, because the right to bring a wrongful death action accrues to and belongs to the personal representative of a decedent, not to the estate of the decedent, and because the right to bring a wrongful death action arises only after the death, a living person is without authority to bind his or her future personal representative to arbitrate that personal representative's claim for wrongful death.
The records on appeal are (of course) devoid of evidence that Turcotte signed the then-living Noella's admission contract in his capacity as her executor or that Woodman signed the then-living Sarah's admission contract in Woodman's capacity as Sarah's administratrix. Thus, Briarcliff *672 has failed to prove that either the executor or the administratrix was a signatory to a contract "calling for arbitration." TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). This failure of proof forecloses any right in Briarcliff to compel these plaintiffs to arbitrate their wrongful death claims.
The mistaken main opinion will tend to increase the number of deaths wrongfully caused by those with the power and disposition to impose adequately drawn arbitration agreements directly or indirectly on their future victims as a condition to providing goods or services. Today's decision will eliminate the full justice of a jury verdict as a deterrent to fatal negligence or wantonness by such providers and as a deterrent to the design, manufacture, or distribution of fatally defective products by such providers or their suppliers.
WOODALL, Justice (dissenting).
The majority's reliance upon SouthTrust Bank v. Ford, 835 So.2d 990 (Ala.2002), is misplaced. In that case, the administratrix was asserting a claim on behalf of the decedent's estate. Here, on the other hand, the personal representatives are bringing statutory wrongful-death actions, in which "[t]he damages recovered are not subject to the payment of the debts or liabilities of the testator or intestate, but must be distributed according to the statute of distributions." § 6-5-410(c), Ala.Code 1975. This distinction is significant. See Breed v. Atlanta B & C R.R., 241 Ala. 640, 4 So.2d 315 (1941). However, the majority simply ignores it. Therefore, I respectfully dissent.
LYONS, Justice (statement of recusal).
The appellees in the above-referenced cases have filed a motion for an "en banc rehearing" in which they waive "any and all conflicts made the basis of recusal for any Justices." They specifically purport to waive any conflict that I "may previously have possessed." The waiver of conflicts notwithstanding, I respectfully decline to participate in this appeal, in which my son, Champ Lyons III, represented the appellant in the trial court and wrote and signed the original briefs filed on behalf of the appellant, even though my son is no longer a member of the law firm representing the appellant on rehearing.
NOTES
[1] The admission contracts pursuant to which Noella and Sarah were admitted to the nursing home were identical, except for the use of their names.